*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0281P (6th Cir.)
File Name: 01a0281p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

BRENTWOOD ACADEMY,
　　　　　*Plaintiff-Appellee,*

　　　　*v.*

TENNESSEE SECONDARY
SCHOOL ATHLETIC
ASSOCIATION; RONNIE
CARTER, Executive Director
and Individually,
　　　　　*Defendants-Appellants.*

No. 98-6113

On Remand from the United States Supreme Court.
No. 97-01249—Todd J. Campbell, District Judge.

Argued: July 19, 2001

Decided and Filed: August 23, 2001

Before: GUY, SUHRHEINRICH, and GILMAN, Circuit
Judges.

———————————

## COUNSEL

**ARGUED:** Richard L. Colbert, COLBERT & WINSTEAD,
Nashville, Tennessee, for Appellants. James F. Blumstein,
VANDERBILT UNIVERSITY LAW SCHOOL, Nashville,

Tennessee, for Appellee. **ON BRIEF:**  Richard L. Colbert, COLBERT & WINSTEAD, Nashville, Tennessee, for Appellants.   James F. Blumstein, VANDERBILT UNIVERSITY LAW SCHOOL, Nashville, Tennessee, H. Lee Barfield, II, BASS, BERRY & SIMS, Nashville, Tennessee, G. Thomas Nebel, Nashville, Tennessee, for Appellee.

———————————

## OPINION

———————————

RONALD LEE GILMAN, Circuit Judge.  This case is before us on remand from the Supreme Court. Brentwood Academy, a private school and member of the Tennessee Secondary School Athletic Association (TSSAA), sued TSSAA pursuant to 42 U.S.C. § 1983 for the alleged violation of its First Amendment rights.   Specifically, Brentwood challenges the constitutionality of TSSAA's "recruiting rule," which prohibits member schools from exerting "undue influence . . . to secure or retain a student for athletic purposes."  The district court granted summary judgment in favor of Brentwood, holding that the recruiting rule violates the school's First Amendment rights.

TSSAA appealed, arguing that it is not a state actor for the purposes of § 1983 and, in any event, that the recruiting rule does not run afoul of the First Amendment.  We reversed the decision of the district court on the basis that TSSAA is not a state actor, and therefore not subject to suit under § 1983. The Supreme Court granted certiorari and disagreed with our opinion, holding that TSSAA is in fact a state actor.  It then remanded the case back to us for further proceedings consistent with the Court's opinion.

We now turn to the merits of TSSAA's appeal.  After considering the parties' supplemental briefs and hearing oral arguments regarding the recruiting rule, we conclude that the district court erred in granting summary judgment in favor of Brentwood.  For the reasons set forth below, we therefore

judgment to Brentwood.  TSSAA now urges us to reverse the district court's judgment to the extent that it operates against Carter in his individual capacity.  We decline to do so.  Such action by us at this time would be premature, because the district court's opinion is silent on the issue of Carter's liability.  We therefore direct the district court on remand to address the issue of Brentwood's claim against Carter in both his official and individual capacities.

## III. CONCLUSION

For all of the reasons set forth above, we **REVERSE** the grant of summary judgment in favor of Brentwood and **REMAND** the case to the district court for further proceedings consistent with this opinion.

*Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton, Ohio*, 240 F.3d 553, 565-66 (6th Cir. 2001) (holding that the village could regulate door-to-door solicitation based on a fear of an "anticipated harm" without proof of actual harm). Finally, TSSAA's newly asserted interest in a level playing field has obviously not been evaluated by either Brentwood or the district court.

The legitimacy of TSSAA's "exploitation" and "level playing field" interests cannot be decided in the abstract as a matter of law. We therefore remand this case to the district court for an evaluation of these asserted interests after TSSAA has had the opportunity to present whatever support it deems appropriate to justify its position.

After the district court decides if either or both of the above interests are legitimate, it should then apply those interests, along with TSSAA's recognized interest in keeping high school athletics in their proper place, to the alleged recruiting rule violations that TSSAA enforced against Brentwood. Its task will be to decide if the punishment exacted for these alleged violations relating to the free game tickets, spring football-practice letters, and the followup telephone calls was appropriate regulatory action narrowly tailored to further TSSAA's legitimate interests as a state actor. This question is also one that cannot be decided in the abstract as a matter of law. TSSAA should therefore be given the opportunity to present whatever support it deems appropriate to justify the need for such regulations. In proceeding with this case on remand, we caution both the parties and the district court to stay focused on the two alleged recruiting rule violations in question, rather than engage in a wide-ranging attack or defense of the recruiting rule as a whole.

### G.   The status of Ronnie Carter

As a final point, we note that the district court did not draw any distinction between TSSAA and Ronnie Carter, the Executive Director of TSSAA, in its grant of partial summary

**REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

## I.  BACKGROUND

### A.   Factual background

Brentwood is a private school located in Brentwood, Tennessee that has historically placed a strong emphasis on athletics. In particular, the football team has been nationally ranked by *USA Today* and has won at least seven TSSAA state championships. Brentwood's basketball team is also well known in athletic circles.

TSSAA is an association comprised of public, independent, and parochial secondary schools from across the state of Tennessee, whose purpose is "to stimulate and regulate the athletic relations of the secondary schools in Tennessee." To that end, TSSAA has enacted a "recruiting rule" designed to place limits on the recruiting practices of secondary schools in soliciting middle school student athletes to participate in secondary school athletics. The recruiting rule is found in Article II, Section 21 of the TSSAA Bylaws, and reads as follows:

> Section 21.  The use of undue influence on a student (with or without an athletic record), his or her parents or guardians of a student by any person connected, or not connected, with the school to secure or to retain a student for athletic purposes shall be a violation of the recruiting rule.

Section 21 is comprised of not only the recruiting rule itself, but also the equivalent of two full pages of questions, answers, and guidelines that provide explanations, details, and examples of the types of conduct the recruiting rule prohibits. This commentary sets forth principles that aid the member schools in complying with the recruiting rule. For example, the first question provides the following information on what the term "undue influence" means:

Q. How is undue influence interpreted in the recruiting rule?
A. A person or persons exceeding what is appropriate or normal and offering an incentive or inducement to a student with or without an athletic record.

The third question explicitly prohibits coaches from initiating contact with students prior to their enrollment in a secondary school:

Q. Is it permissible for a coach to contact a student or his or her parents prior to his enrollment in the school?
A. No, a coach may not contact a student or his or her parents prior to his enrollment in the school. This shall apply to all students whether or not they have an athletic record.

The fourth question asks: "What are some of the guides used in determining whether there has been undue influence used which would result in a violation of the recruiting rule?" It then provides seven examples. The third example reiterates that the recruiting rule prohibits "[a]ny initial contact or prearranged contact by a member of the coaching staff or representative of the school and a prospective student/athlete enrolled in any member school except where there is a definite feeder pattern." The seventh example specifically prohibits "[a]dmitting students to athletic contests free of charge where there is an admission being charged at the contest except where there is a definite feeder pattern involved with the school." The feeder-school exemption is not applicable to Brentwood, because it has no feeder pattern with any school.

Several representatives of Brentwood met with Ronnie Carter, the Executive Director of TSSAA, on February 10, 1993. This meeting was held at the request of Brentwood for the purpose of clarifying what types of recruiting practices would be acceptable under the recruiting rule. Michael S.

time, place, or manner regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted.

*Ward*, 491 U.S. at 798-800 (internal quotation marks, alterations, and ellipses omitted).

In TSSAA's response to Brentwood's motion for summary judgment, TSSAA asserted two interests in justification of the recruiting rule: (1) to keep high school athletics in their proper place subordinate to academics and (2) to protect student athletes from exploitation. TSSAA proffered an additional interest on appeal, namely that of fostering a level playing field between the various member schools. This latter interest seeks to establish a degree of competitive equity in high school athletics by regulating how the member schools recruit student athletes.

This court previously recognized the validity of TSSAA's first asserted interest when it concluded that "[TSSAA] is ordinarily entitled to enforce its athletic rules in order to deter students, parents and school officials from trying to turn high school athletics into an activity that overshadows or unduly interferes with academic life." *Crocker v. Tenn. Secondary Sch. Athletic Ass'n*, 980 F.2d 382, 386-87 (6th Cir. 1992). The district court below also acknowledged this interest as a substantial one. TSSAA's other two justifications, however, are very much in dispute.

Brentwood, for example, argues that there is no support in the record for the proposition that student athletes need protection from exploitation. The district court agreed. It concluded that TSSAA offered no proof that exerting undue influence on middle school athletes to recruit them for athletic purposes actually *harms* those students. Proof of actual harm, however, is not required in order to recognize a state actor's interest in preventing reasonably anticipated harm. *See*

The above principles are fully applicable to the case before us. Although the recruiting rule by itself is certainly subject to challenge based on vagueness and overbreadth, it is accompanied by the equivalent of two full pages of question-and-answer explanations and guideline interpretation. As a whole, the rule gives reasonable notice of what is prohibited, especially as applied to Brentwood. The interpretive commentary explicitly states that free tickets cannot be provided to prospective students, nor can a coach initiate contact with potential players before they enroll in the school. Brentwood allegedly did both of these things, and was punished accordingly. To claim now that the rule is overbroad as applied to Brentwood strains credulity. We therefore conclude that the district court erred in holding the recruiting rule unconstitutional on the basis of being facially overbroad.

### F.   Remand is required to determine if the recruiting rule is narrowly tailored to meet TSSAA's substantial interests

As set forth in Part II.D. above, we have determined that the recruiting rule is a content-neutral regulation subject to intermediate scrutiny for the purpose of First Amendment analysis. This means that TSSAA has the burden of establishing (1) the legitimacy of its alleged substantial governmental interests and (2) that the recruiting rule as applied to Brentwood in the case before us is narrowly tailored to further these governmental interests. The Supreme Court has described this analysis as follows:

> [A] regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but . . . it need not be the least restrictive or least intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation . . . . The validity of

Peek, a lawyer for Brentwood, followed up with a letter on February 24, 1993 that was intended to confirm Brentwood's understanding of the numerous ways in which Brentwood could communicate with prospective students about its athletic programs without violating the recruiting rule.

In 1997, several coaches at other member schools complained to TSSAA that Brentwood had violated various TSSAA rules. Carter conducted an investigation of the complaints. On July 27, 1997, Carter wrote a letter to Brentwood outlining six alleged violations of TSSAA rules. Five violations related to the recruiting rule and one to the sports-calendar rule. Only the recruiting rule violations are at issue in this appeal.

The alleged recruiting rule violations arose from two incidents. The first incident occurred when Brentwood's then Athletic Director and Head Football Coach, Carlton Flatt, provided free tickets to a middle school coach for a Brentwood football game. These tickets were then used by the middle school coach to take several of his students to attend the game. The second incident arose when Coach Flatt sent letters and made followup telephone calls in the spring of 1997 to students from other schools who had contractually agreed to attend Brentwood in the fall of 1998, but who had not themselves solicited any information regarding Brentwood's athletic program. Carter, on behalf of TSSAA, imposed a number of penalties on Brentwood for these violations.

Brentwood appealed the sanctions according to the two-step process set forth in the TSSAA Bylaws. Carter presided at the first step and reduced the sanctions as a consequence of the appeal. Brentwood next appealed to the full Board of Control of TSSAA, which at the time consisted only of public high school principals. A hearing was held on August 23, 1997. The Board of Control found that Brentwood had violated the recruiting rule by admitting student athletes free of charge to an athletic contest and by contacting middle

school students while they were enrolled in other schools. As punishment, the Board fined Brentwood $3,000, placed its athletic program on probation for four years, and suspended Brentwood from participating in tournaments and conducting certain types of off-season practice for two years.

## B.   Procedural history

Brentwood filed suit against TSSAA in the United States District Court for the Middle District of Tennessee on December 12, 1997. It alleged that TSSAA was a state actor and that TSSAA's enforcement of the recruiting rule violated its First and Fourteenth Amendment rights. Brentwood also sought an injunction against TSSAA's enforcement of the recruiting rule. Faced with cross-motions for summary judgment, the district court granted Brentwood's motion for summary judgment on its First Amendment claim and enjoined TSSAA from enforcing the recruiting rule.

TSSAA appealed the district court's grant of summary judgment in favor of Brentwood, arguing that (1) TSSAA is not a state actor, thereby rendering it immune from constitutional scrutiny, and (2) the recruiting rule in any case does not violate Brentwood's First Amendment rights. Our prior opinion did not reach the merits of TSSAA's challenge to the district court's First Amendment ruling because we concluded that TSSAA was not a state actor. *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 180 F.3d 758 (6th Cir. 1999). Brentwood sought review of our decision by the Supreme Court, which granted certiorari. *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 528 U.S. 1153 (2000). The Supreme Court reversed our decision, holding that TSSAA is a state actor, and remanded the case to us for further proceedings consistent with its opinion. *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001). Before us now are the merits of TSSAA's appeal regarding the constitutionality of the recruiting rule.

noted, the seventh example in response to question four under the recruiting rule includes "[a]dmitting students to athletic contests free of charge where there is an admission being charged at the contest . . . ." Furthermore, the third question following the recruiting rule prohibits a coach from contacting students not enrolled in their school:

> Q.  Is it permissible for a coach to contact a student or his or her parents prior to his enrollment in the school?
> A.  No, a coach may not contact a student or his or her parents prior to his enrollment in the school. This shall apply to all students whether or not they have an athletic record.

These questions, answers, and guidelines are entitled to consideration in evaluating an overbreadth challenge. *See Forsyth County*, 506 U.S. at 131 ("In evaluating [the] facial challenge, we must consider the [association's] authoritative instructions of the [rule], including its own implementation and interpretation of it."); *see also Ward*, 491 U.S. at 794-96 (holding that the city's sound-amplification guideline and the city's interpretation of the guideline provided sufficient limiting instructions to render the ordinance's statements ensuring the "best sound" and "appropriate sound quality" immune from an overbreadth challenge). We also note that the Supreme Court has

> repeatedly expressed its reluctance to strike down a statute on its face where there were a substantial number of situations to which it might be validly applied. Thus, even if there are marginal applications in which a statute would infringe on First Amendment values, facial invalidation is inappropriate if the remainder of the statute . . . covers a whole range of easily identifiable and constitutionally proscribable . . . conduct.

*Parker v. Levy*, 417 U.S. 733, 760 (1974) (internal quotation marks omitted and ellipses in original).

"To succeed . . . the complainant must demonstrate that the law is impermissibly vague in all of its applications." *Village of Hoffman Estates*, 455 U.S. at 497. Cases that have held legislation unconstitutional on its face under the overbreadth doctrine, moreover, have not created "any exception from the general rule that constitutional adjudication requires a review of the application of a statute to the conduct of the party before the Court." *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 798 (1984); *see also Bd. of Trustees of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 484-85 (1989) ("It is not the usual judicial practice, however, nor do we consider it generally desirable, to proceed to an overbreadth issue unnecessarily – that is, before it is determined that the statute would be valid as applied. Such a course would convert use of the overbreadth doctrine from a necessary means of vindicating the plaintiff's own right not to be bound by a statute that is unconstitutional into a means of mounting gratuitous wholesale attacks upon state and federal laws.").

In our opinion, the district court erred in striking down the recruiting rule as facially overbroad without focusing on how the rule was applied to Brentwood. We turn now to this analysis. TSSAA found that Brentwood's two violations of the recruiting rule consisted of admitting middle school athletes free of charge to an athletic contest at Brentwood and of contacting middle school students to inform them of Brentwood's athletic practices before they were enrolled there. In particular, the second violation arose from Coach Flatt's letter to incoming students regarding spring football practice and followup telephone calls to the students. Pursuant to Article II, Section 1(b) of TSSAA's Bylaws, a student is not considered "enrolled" until he or she has attended the school for at least three days. None of the incoming students met this criterion.

Both of Brentwood's alleged violations are explicitly listed as prohibited conduct that constitutes "undue influence" in the commentary accompanying the recruiting rule. As previously

## II. ANALYSIS

### A. Standard of review

We review de novo the district court's grant of summary judgment. *See*, *e.g.*, *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000). Summary judgment is proper when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The judge is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists only when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

### B. Brentwood has not waived its right to challenge the constitutionality of the recruiting rule

TSSAA now recognizes, as it must under the Supreme Court's ruling, that it is a state actor subject to constitutional challenges. It nevertheless argues that Brentwood has waived its right to question the constitutionality of the recruiting rule because, by voluntarily choosing to be a member of TSSAA, it has agreed to abide by the rules of the organization. TSSAA thus contends that Brentwood is faced with "the choice between joining TSSAA and complying with the rules or competing in interscholastic athletics as a non-member of TSSAA."

The five cases that TSSAA cites to support its argument, however, are distinguishable from the case at hand. *See Town of Newton v. Rumery*, 480 U.S. 386 (1987) (holding that a criminal defendant can waive important constitutional rights by entering into a plea bargain); *D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174 (1972) (holding that where there is no

unequal bargaining power or overreaching, debtors can voluntarily, intelligently, and knowingly waive due process rights by signing a cognovit note, which is an agreement by which a debtor consents in advance to a holder's obtaining a judgment without notice or hearing); *K.M.C. Co. v. Irving Trust Co.*, 757 F.2d 752, 758 (6th Cir. 1985) (concluding that when a party knowingly, voluntarily, and intentionally signs a jury waiver provision in a civil case, that party has waived its right to a jury trial); *International Union v. Dana Corp.*, 697 F.2d 718, 719 (6th Cir. 1983) (holding that a settlement agreement between Dana and the union rendered an appeal moot, even though the agreement "effectively prevented Dana from communicating with its employees regarding [a union campaign] at one of Dana's subsidiaries"); *Lake James Cmty. Volunteer Fire Dep't v. Burke County*, 149 F.3d 277 (4th Cir. 1998) (concluding that an agreement between a volunteer fire department and the county that prohibited the fire department from suing the county was enforceable, even though it waived the fire department's constitutional right to petition the government).

The common legal thread among the above five cases is that they all involve parties that actually waived their right to sue. There is no comparable TSSAA provision prohibiting members from challenging the constitutionality of the recruiting rule. Moreover, Brentwood points out that what was once called the "bitter-with-the-sweet" doctrine has been replaced with the "unconstitutional conditions" doctrine. In the words of the Supreme Court:

> Recognizing that constitutional violations may arise from the deterrent, or chilling, effect of governmental [efforts] that fall short of a direct prohibition against the exercise of First Amendment rights . . . our modern unconstitutional conditions doctrine holds that the government may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit.

*see also City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 422-23 (1993) (striking down a city's selective and categorical ban on the distribution, via newsrack, of "commercial handbills" as violative of the First Amendment).

We conclude that TSSAA's argument in this regard is unpersuasive. Brentwood is an educational institution. The fact that it is private does not render its academic, athletic, and spiritual goals commercial. Nor is TSSAA able to cite any authority in support of its "commercial transaction" argument as applied to the recruiting of student athletes by a private school. Because we conclude that the recruiting rule does not constitute a regulation of commercial speech, we must now turn to TSSAA's alternate contention that the rule is not unconstitutional under the overbreadth doctrine.

"A facial challenge to a legislative Act, is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). The Supreme Court has set forth the following principles for evaluating facial challenges under the overbreadth doctrine:

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

*Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

### E.   The recruiting rule is not facially overbroad in violation of the First Amendment

The district court also held that even if the recruiting rule is not an unconstitutional content-based regulation, it runs afoul of the First Amendment because the language of the rule provides TSSAA with the "unbridled discretion to penalize those expressing points of view with which it disagrees." In so ruling, the district court relied on *Forsyth County, Ga. v. Nationalist Movement*, 515 U.S. 123, 129-33 (1992). *Forsyth County* involved a facial challenge under the "overbreadth doctrine" to a county ordinance that required parties to obtain a permit and pay a fee in order to gain authorization to speak publicly, hold a public parade, or assemble. A challenge under this doctrine can be mounted in "cases where every application creates an impermissible risk of suppression of ideas, such as an ordinance that delegates overly broad discretion to the decisionmaker." *Id.* at 129. The district court concluded that terms such as "undue influence" and "appropriate or normal" in the recruiting rule are so undefined and provide TSSAA with such arbitrary discretion that the rule is an impermissibly overbroad regulation.

TSSAA first attempts to avoid a challenge under the overbreadth doctrine by arguing that the recruiting rule regulates commercial speech. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982) ("the overbreadth doctrine does not apply to commercial speech"). It claims that because Brentwood is a private school, recruiting students is a commercial activity. We agree with the district court that the recruiting rule does not invoke the commercial speech analysis. The "test for identifying commercial speech" involves determining whether a regulation relates to a "commercial transaction." *Bd. of Trustees of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 473-74 (1989) (determining that America Future Systems, Inc.'s "tupperware party"-like lectures on its housewares in college dormitories constituted commercial speech, and remanding the case for review under the intermediate scrutiny standard);

*Bd. of County Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996) (internal quotation marks and citation omitted) (alterations in original).

*Umbehr* involved a § 1983 claim for unlawful retaliation brought against the county's governing body by an independent contractor who provided trash collection services to the county. The Court held that the contractor had stated a cause of action based on the allegation that his contract was terminated in retaliation for his criticism of the county commission. *Umbehr* is an extension of the protections provided to public employees under the First Amendment. *See Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968) (holding that the board of education violated a school teacher's First Amendment rights by dismissing him because he had criticized the board in a letter to the local newspaper). We believe that the Supreme Court's rulings that parties do not give up First Amendment rights by contracting with, or being employed by, a public agency forecloses TSSAA's argument that Brentwood gave up its right to challenge the constitutionality of the recruiting rule because it voluntarily joined TSSAA.

TSSAA argues, however, that the First Amendment protection afforded by *Umbehr* and *Pickering* applies only when the content of a contractor's or employee's speech involves a "matter of public concern." *Umbehr*, 518 U.S. at 685; *see also Pickering*, 391 U.S. at 574. It claims that the recruiting rule does not implicate a matter of public concern, and is therefore unworthy of First Amendment scrutiny. But TSSAA cannot have it both ways. As set forth in Part II.F. below, TSSAA will have to establish that the recruiting rule embodies substantial governmental interests as a necessary element of the rule's enforceability. These substantial interests will by definition implicate a "matter of public concern." *See Pickering*, 391 U.S. at 573 (holding that issues involving the local board of education were "matters of public importance").

We therefore conclude that Brentwood has not waived its right to challenge the constitutionality of the recruiting rule by voluntarily joining TSSAA. This means that we must now reach the merits of the district court's First Amendment analysis of the recruiting rule.

### C. The district court erred in holding that the recruiting rule is a content-based regulation for the purposes of First Amendment analysis

TSSAA's appeal broadly challenges the analytical framework that the district court used to determine the constitutionality of the recruiting rule. The primary contention of TSSAA is that the district court erred in concluding that the recruiting rule is a content-based regulation that fails strict scrutiny review. We agree.

A fundamental premise of First Amendment jurisprudence is that the "government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995). Such regulations are subject to "the most exacting scrutiny," *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994), which means that the state actor must show "that its regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that end." *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 231 (1987). On the other hand, content-neutral regulations that simply restrict the time, place, and manner of speech are subject to intermediate scrutiny. *See Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton, Ohio*, 240 F.3d 553, 560 (6th Cir. 2001) (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). Under that analysis, content-neutral regulations must be "narrowly tailored to serve a significant governmental interest . . . that . . . leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

at a state fair to do so only at a rental booth in the designated area).

The Supreme Court has recognized that content-neutral regulations can have a dampening effect on the substance of the protected speech, but that such limitations are constitutionally permissible. "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (upholding the regulation of noise levels at musical performances in a public park to avoid undue intrusion on the tranquility of the surrounding public and residential areas). Assuming that TSSAA is able to successfully establish that it has substantial governmental interests in support of the recruiting rule (see Part II.F. below), we cannot say that the rule's incidental effect of preventing members of high school coaching staffs from initiating contact with middle school students is fatal to content neutrality. *See United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.").

Based on our conclusion that the recruiting rule is content neutral, it is subject to an intermediate scrutiny standard of review. *See Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton, Ohio*, 240 F.3d 553, 560 (6th Cir. 2001). "'[C]ontent-neutral' time, place, and manner regulations are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." *City of Renton*, 475 U.S. at 47; *see also Ward*, 491 U.S. at 798 ("the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but . . . it need not be the least restrictive or least intrusive means of doing so").

## D. The recruiting rule is a content-neutral regulation subject to intermediate scrutiny

We are of the opinion that the recruiting rule is a content-neutral regulation analogous to certain zoning ordinances that have been deemed to contain reasonable time, place, and manner restrictions. In *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46 (1986), for example, an ordinance provided specific zoning requirements for adult theaters. The Supreme Court found that "the Renton ordinance [was] aimed not at the *content* of the films shown at 'adult motion picture theatres,' but rather at the *secondary effects* of such theaters on the surrounding community." *Id.* at 47 (emphasis in original). As long as the zoning ordinance did not ban the existence of these theaters outright, the Supreme Court found it to be content neutral. *See id.* at 46 ("The Renton ordinance . . . does not ban adult theaters altogether, but merely provides that such theaters may not be located within 1,000 feet of any residential zone, single- or multiple-family dwelling, church, park, or school."). Similarly, the recruiting rule does not completely ban all communications between coaches and prospective students, but does keep them "at a distance" by prohibiting the coaches and those acting on their behalf from initiating the contact.

Other examples of regulations that have been upheld against First Amendment challenges despite limiting the time, place, and manner of the targeted activities include *Madsen v. Women's Health Ctr, Inc.*, 512 U.S. 753, 772 (1994) (upholding a state court injunction that restricted the use of sound amplification equipment and other noise created by anti-abortion protesters to certain hours and days); *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 814-15 (1984) (upholding an ordinance that prohibited the posting of signs on public property based on the government's interest in promoting aesthetics); *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640 (1981) (upholding a state regulation requiring a religious organization that desired to distribute religious materials and solicit donations

The Supreme Court has recognized that "[d]eciding whether a particular regulation is content based or content neutral is not always a simple task." *Turner Broad.*, 512 U.S. at 642. In this instance, the district court concluded that the recruiting rule "is content-based because the interests asserted by [TSSAA] to support the ban focus on the content of the message and the effect of the message on the listener." We respectfully disagree.

In our opinion, the recruiting rule does not impose a total ban, or a "Berlin Wall" as Brentwood calls it, on communications between secondary schools and middle school athletes regarding high school athletics. Rather, the recruiting rule prohibits secondary schools from exerting an "undue influence" on students with the goal of "secur[ing] or retain[ing] a student for athletic purposes." We do not see how the recruiting rule, as defined by the questions, answers, and guidelines contained within the TSSAA Bylaws, bans the substantive content of any particular message. It is clear to us that the greatest restriction imposed by the recruiting rule is the prohibition on coaches, coaching staff, and school representatives from initiating contact with middle school students for the purpose of recruiting student athletes.

In our view, prohibiting coaches from initiating contact with students or their parents prior to enrollment in the school is a limitation on the manner in which secondary schools can communicate with students about their athletic programs. It does not mean, however, that Brentwood has no other outlet for providing such information to prospective students, or that middle school students have no way of finding out this information or learning about their educational options.

Perhaps the strongest evidence in the record that supports our view that the recruiting rule does not constitute a total ban on communications between secondary schools and prospective students regarding athletic programs is the letter that Brentwood attorney Michael Peek wrote to Ronnie Carter following their meeting in February of 1993. The letter

details numerous ways in which Brentwood can get its message about athletics out to prospective students. Examples of conduct that Peek claims were explicitly approved by Carter on behalf of TSSAA include the following: admissions officers and representatives of Brentwood can supply information that real estate agents may give to new families moving to the community; Brentwood can respond to direct inquiries from students or their families that have contacted it for information; Brentwood can advertise in any publication it chooses; and Brentwood can contact 7th and 8th graders in any school regardless of their extracurricular activities and interests if such contact is made in the context of a letter or other communication directed to members of the class as a whole. We believe that this range of options, which is not exclusive, acknowledges that Brentwood has multiple ways of communicating with middle school students to provide them with information about the academic, athletic, and spiritual aspects of the educational experience at Brentwood.

We fail to see how the recruiting rule "effectively drive[s] certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991). But Brentwood maintains that the recruiting rule constitutes a content-based regulation of speech in at least three ways. First, it argues that the recruiting rule prohibits independent schools and their representatives from "discuss[ing] an entire topic." *Consol. Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530, 537 (1980). Second, Brentwood claims that the rule prevents prospective students and their parents from learning about independent educational options. Finally, it maintains that TSSAA enacted the recruiting rule to prevent prospective students from learning about athletic programs at independent secondary schools.

Brentwood's three contentions, however, are not persuasive. As described above, the prohibitions of the recruiting rule do not prevent representatives of Brentwood

from discussing the entire topic of its athletic programs. Prospective students and their parents also have a wide range of available means to receive information about the athletic and educational opportunities that Brentwood provides. Nor is there evidentiary support for Brentwood's position that the recruiting rule is a content-based regulation designed by TSSAA out of fear of what prospective students would learn about the athletic programs at independent secondary schools. If TSSAA had been motivated by a fear of the impact that information regarding athletic programs would have on students, it would presumably have banned recruiting and communications altogether. This it did not do.

Finally, we reject Brentwood's contention that the recruiting rule is unconstitutional because it controls who can speak for Brentwood. The recruiting rule is not an unconstitutional regulation that "dictat[es] . . . the speakers who may address a public issue." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 784-85 (1978) (holding that a state statute prohibiting expenditures by banks and business corporations for the purpose of influencing the vote on any question other than one materially affecting the business interests of the corporation unconstitutionally infringed on their First Amendment rights). Although the rule emphasizes that coaches and members of the coach's staff must refrain from exerting "undue influence" by initiating contact with prospective students, the rule does not ban these persons from communicating with students who themselves initiate contact.

In sum, we conclude that the district court erred in holding that the recruiting rule is a content-based regulation subject to analysis under "the most exacting scrutiny." *Turner Broad. Sys. Inc. v. FCC*, 512 U.S. 622, 642 (1994). We therefore turn to an analysis of the rule as a content-neutral regulation.