ROGERS, Circuit Judge,
dissenting.
High school football is a game. Games have rules.
To have federal courts, under the guise of applying the enduring principles of the First Amendment, reverse the ordinary application of high school football recruiting rules — where the core values of the Amendment are not even remotely involved' — unduly trivializes these constitutional principles. This is no more a case involving our nation’s ideal of freedom of expression than a case involving a coach who is thrown out of a game for talking back to a referee. This is instead a case involving game participants who challenge the discretionary administration of participation rules. Of course, good lawyers can characterize almost any perceived injustice as a constitutional case (and maybe even an antitrust case to boot), but courts should be hesitant to go along.
*445 The Supreme Court has properly instructed us in this case that the defendant is a state actor for constitutional purposes, and this court in its 2003 decision properly determined that Brentwood Academy did not contract away all of its constitutional rights by joining TSSAA. If, for instance, TSSAA discriminated on the basis of race or religion or the expression of political views, the earlier court holdings in this case would insure the availability of federal court relief. But here TSSAA is clearly doing nothing more than administering its game rules — the game being interschool high school football. Dissatisfaction with application of game rules does not become a First Amendment violation merely because the rule involves speech.
Recruiting and eligibility rules are of course a very real part of the game itself, protecting the student-athlete and the brand of competition agreed to. The game of football, like any game, has rules which the competitors accept as an inherent part of participation. In addition to the basics of the game, such as how many players may participate at one time and how many points are awarded for a touchdown, competitors agree on further rules governing competition more broadly, agreeing on rules that govern how teams are grouped into leagues, how the champion of the league is determined and who is eligible to participate in a game. Fierce competition among high schools for talented student athletes, and the demand for success from fans and alumni, bring the potential for excess. As a result, athletic leagues comprised of educational institutions, such as TSSAA, have rules governing both the recruitment of student-athletes and the eligibility of student-athletes to participate in athletic contests. Anti-recruiting rules may inhibit “speech,” but so do the ordinary rules of a football game that allow players and coaches to be removed for disputing the propriety of a referee’s call.
Accordingly, I dissent from those portions of the majority’s decision upholding plaintiffs First Amendment claims. I also dissent from the finding of a due process violation and from the decision to reverse the district court’s determination that there is no basis for antitrust liability in this case,[1]
I.
While the insubstantiality of plaintiffs First Amendment claim is clear, the complexities of modern First Amendment jurisprudence make it less clear precisely why the claim is not substantial. There are two parts to the answer. First, ordinary enforcement of game rules does not amount to an unconstitutional limit of free expression in part because participants agree to play in the games. Second, ordinary enforcement of game rules does not amount to an unconstitutional limit on free expression because rules (including rules limiting speech) are inherently necessary to ordered competition. Of course these two ideas substantially overlap, but they find expression in different strands of First Amendment law. Both strands reflect the underlying idea that rules have value for the sake of being rules, and only trench on First Amendment concerns when their relationship to the game is too attenuated. Enforcement of the recruitment rule in this case is clearly warranted because Brentwood agreed to general applicability of the rules (although not to rules that draw distinctions unrelated to the purpose for the rules, such as interpretations of the rules that discriminate, for *446 example, on the basis of political party-affiliation). Enforcement of the recruitment rule in this case is also clearly warranted because, in the context of athletic competition, the rule is sufficiently related to legitimate public interests and narrowly tailored. Under each of these arguments, and certainly under at least one of the two, there is no First Amendment violation in this case.
I recognize that the first argument is subject to the criticism that it ignores our earlier 2001 decision and renders the extensive district court proceedings on remand an exercise in futility. In addition, the second argument is subject to the criticism that it does not adequately defer to the factual findings of the district court. While I am sympathetic with the inclinations undergirding these arguments, I cannot in the end accept that they compel us to affirm the finding that enforcement of an unexceptional athletic anti-recruiting rule violates the First Amendment.
A.
First of all, Brentwood agreed to comply with TSSAA anti-recruiting rules, and thus gave up its right to engage in some expressive activity otherwise protected by the First Amendment. That is not to say that it gave up all of its rights to engage in expressive activity vis-a-vis TSSAA. But it obviously gave up some. By comparison, a person by accepting employment by the government gives up some rights protected by the First Amendment (e.g., the right to read the newspaper all day long), but does not give up all First Amendment rights (e.g., the right to talk politics during a break).
Brentwood in this case gave up its right to engage in certain types of speech, and may not assert such a right now. See Leonard v. Clark, 12 F.3d 885, 889-90 (9th Cir.1993) (affirming the district court’s decision not to reach the issue of whether a labor union’s free speech rights had been violated where the district court had first determined that the union waived its First Amendment protections in a collective bargaining agreement). Brentwood in short gave up its right to speak in violation of TSSAA’s game rules (including its anti-recruiting rules) as consideration for access to TSSAA leagues and tournaments, and to benefit from TSSAA’s enforcement of its rules against competitors.

1. Free Speech Rights May Be Given Up

Most individually held constitutional rights may be waived, if done knowingly, intelligently, and with sufficient awareness of relevant circumstances and likely consequences. See Brady v. United States, 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970) (recognizing waiver of the constitutional right to a trial in a criminal case); Leonard, 12 F.3d at 889-90 (upholding a contractual waiver of First Amendment rights where it was knowing, voluntary, and intelligent); Erie Telecomms. v. Erie, 853 F.2d 1084, 1096 (3d Cir.1988) (“constitutional rights, like rights and privileges of lesser importance, may be contractually waived where the facts and circumstances surrounding the waiver make it clear that the party foregoing its rights has done so of its own volition, with full understanding of the consequences of its waiver”).
The power to waive individually held constitutional rights extends to First Amendment speech-related protections. The Supreme Court has repeatedly held that contractual waivers of free speech protections may be judicially enforced. In Snepp v. United States, the Supreme Court held that the Central Intelligence Agency (CIA) was not barred by the First Amendment from enforcing an employ *447 ment agreement that required CIA employees to get its permission before publishing writings about agency activities. 444 U.S. 507, 507-511, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980). The Court upheld this prior restraint on speech in part because the CIA employee in that case had voluntarily signed the employment agreement. See id. at 510-11, 100 S.Ct. 763. Similarly, in Rust v. Sullivan, the Court upheld the federal government’s restriction on the abortion-related speech of staff members working for doctors receiving Title X funds. 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). The Court upheld this restriction because it was “a consequence of [the staff members’] decision to accept employment.” Id. at 199, 111 S.Ct. 1759.
The Third, Fourth, and Ninth circuits have also honored contractual waivers of First Amendment rights contained in contracts with state actors. Erie Telecomms., 853 F.2d at 1094-98 (upholding a cable company’s waiver of First Amendment rights in a franchise agreement with a city); Lake James Cmty. Volunteer Fire Dep’t., Inc. v. Burke County, 149 F.3d 277, 280-82 (4th Cir.1998) (holding enforceable a Fire Department’s “limited waiver.” of some First Amendment rights in a contract with a county government); Leonard, 12 F.3d at 889-92 (upholding a labor union’s waiver of some First Amendment rights to a city as provided in a collective bargaining agreement).
While these cases demonstrate that constitutional rights can be bargained away, they do not begin to cover all the possibilities. Some constitutional rights are so obviously alienable that no one would challenge the idea. To become a prison guard, a person may give up the right to be out of the prison premises for eight hours a day. To become a judge, a person may give up the right to solicit charitable contributions. To become a flight attendant, a person may give up the right to refrain from speaking before the plane takes off. And so on. Again, this is not to say that such persons give up all free expression rights, but they certainly give up some.

2. Brentwood Gave Up its Right to Certain Speech

In this case Brentwood gave up some of its free speech rights when it signed a one-year contract agreeing to abide by TSSAA’s game rules, including its anti-recruitiijg rules. Brentwood’s promise is not materially different from the CIA’s employment' agreement or the speech restrictions on the Rust staff employees. In each of these situations, the promisors agreed not to speak in certain ways in return for something they desired.
Brentwood’s waiver was doubtless knowing, voluntary, and intelligent. The anti-recruiting rule and supplemental materials explicitly forbade Coach Flatt from “contact[ing] a student or his or her parents prior to his enrollment in the school.” Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass’n, 262 F.3d 543, 549 (6th Cir.2001). . Nothing could be clearer, and Coach Flatt did exactly this. His waiver— and his violation of this crystal clear rule— were voluntary, knowing, and intelligent. Moreover, there is no evidence on the record that would suggest that Brentwood had agreed to TSSAA’s rules involuntarily or without knowledge. That Brentwood, a sophisticated and tenacious party, never contested in this appeal that it understood the anti-recruiting, rules tells volumes about the intelligence of its waiver.

3. Brentwood’s Waiver Has No Unconstitutional Conditions Doctrine De- . feet

Brentwood’s, waiver does not run afoul of, .the- “unconstitutional conditions” doctrine because the anti-recruiting rules re. *448 late to participation in TSSAA athletics and Coach Flatt’s recruiting letter and follow-up phone calls do not bear on matters of public concern.
“Under the well-settled doctrine of ‘unconstitutional conditions,’ the government may not require a person to give up a constitutional right ... in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to the” right surrendered. Dolan v. City of Tigard, 512 U.S. 374, 385, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994) (citing Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Pickering v. Bd. of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). When the free speech rights of government employees are at issue, this doctrine prevents the surrender of speech rights only if the speech bears on some matter of public concern. Connick v. Myers, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).
In this case the unconstitutional conditions doctrine will invalidate Brentwood’s waiver only if Brentwood’s membership in TSSAA has “little or no relationship” to the free speech rights surrendered (i.e., to the anti-recruiting rules); or if, applying the Connick standard, Coach Flatt’s recruiting speech bore on a matter of public concern.
The anti-recruiting rules relate to participation in TSSAA and limit no speech on any matter of public concern. By limiting Coach Flatt’s right to recruit unenrolled middle-school students for the football team, the anti-recruiting rules regulate the formation of teams that compete in TSSAA. It is an off-the-field regulation thought to enhance the quality of on-the-field competition by promoting equity in the relative strength of teams. The anti-recruiting rules, therefore, have a clear relationship, not “little or no relationship,” to participation in TSSAA. Obviously, there is no reason to think that Coach Flatt’s recruiting letter or follow-up phone calls touch upon any matter of public concern under Connick. Consequently, there is no unconstitutional conditions doctrine defect in Brentwood’s agreement to comply with recruitment rules.
There is no reason to limit the Connick no-public-concern analysis strictly to government employee cases. Connick is analogous because the restriction on Brent-wood’s recruiting speech emanates from the necessity of limiting game participants’ speech as part of the competitor-referee relationship. Cf. Maj. Op. at 422 (observing that lawful restrictions on government employees’ speech emanate from the necessity of limiting their speech as part of the employer-employee relationship). The operation of a sports league demands speech limits that are germane to the agreed-upon venture no less than does employment. To extend an earlier analogy, a government employee harms the employer-employee relationship when he exercises his First Amendment right to read the newspaper for his entire workday. Likewise, Coach Flatt harmed the competitor-referee relationship between Brentwood and TSSAA when he disobeyed anti-recruiting rules that others were presumably following.
Brentwood’s promise to follow the anti-recruiting rules has no unconstitutional conditions doctrine defect because it has a relationship to Brentwood’s participation in TSSAA and limits no speech of public concern.' Brentwood’s First Amendment claims should be dismissed.
A Our 2001 Opinion Leaves Open the Possibility That Brentwood Gave Up Those Free Speech Rights That Might Interfere With TSSAA Game Rules
In my view, this court’s 2001 opinion does not at all foreclose the foregoing ar *449 gument. Compare Maj. Op. at 420; Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass’n, 262 F.3d 543, 550 (6th Cir.2001). The 2001 opinion on the contrary rejected a different and overly broad theory of waiver: that Brentwood had given up its right to sue entirely. See id. The 2001 opinion noted that the cases cited by TSSAA in support of this overly broad waiver theory involved parties that had explicitly “waived their right to sue,” and concluded that “[tjhere is no comparable TSSAA provision prohibiting members from challenging the constitutionality of the recruiting rule.” Id. (emphasis added). In other words, the 2001 opinion says only that Brentwood did not waive its right to sue generally. That is true. While retaining its right to sue generally, Brentwood waived a more limited group of rights— including any free speech-related theories that would invalidate the normal administration of rules that Brentwood agreed to, including the anti-recruiting rules. Brent-wood could for instance sue on the basis of the unconstitutional conditions doctrine and indeed this court relied upon such cases in our rejection of the blanket waiver argument. See id.
By analogy, the staff personnel in Rust did not waive their right to sue about their employment conditions or free speech rights generally. Surely a court could have heard a political discrimination claim brought against the government funding authority by any such staff members. Yet the Court still held that the staff members, by accepting employment, waived First Amendment objections to Title X’s abortion-speech restrictions. See Rust, 500 U.S. at 199, 111 S.Ct. 1759 (“employees’ freedom of expression is limited during the time that they actually work for the project; but this limitation is a consequence of their decision to accept employment in a project, the scope of which is permissibly restricted by the funding authority”). In this case, Brentwood waived only speech rights that would interfere with its agreement to abide by TSSAA’s game rules and that did not violate the unconstitutional conditions doctrine.
The 2001 opinion never addressed this narrower theory of waiver and thus does not foreclose any and all arguments based on waiver. Brentwood waived its right to have Coach Flatt contact as yet unenrolled students. Its First Amendment claim should be dismissed on that ground.
B.
While our previous decision did not foreclose the above argument, it did direct the lower court to apply the test for content-neutral speech restrictions, and I certainly respect the majority’s reluctance to disregard the district court’s extensive factual inquiry. In my view, however, none of the district court’s factual findings are sufficient to warrant the legal conclusion that Brentwood’s First Amendment rights were violated by TSSAA’s enforcement of the anti-recruiting rules. The very nature of game rules requires that they be somewhat arbitrary. If upon remand the district court had found a restriction on speech of a public concern, or a restriction on speech unrelated to the game of football, our review of the district court’s conclusion might support affirmance. Nothing like that was found in this case.
In this case, TSSAA’s game-related legitimate interests in subordinating athletics to academics, preventing the exploitation of middle school student-athletes, and furthering competitive equality of teams, together fully justify the enforcement of the anti-recruiting rules against Brent-wood. The anti-recruiting rules are reasonable time, place or manner restrictions on speech that are narrowly tailored to serve a significant government interest *450 and leave open alternative channels of communication. See Ward v. Rock Against Racism, 491 U.S. 781, 799, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); Tucker v. City of Fairfield, 398 F.3d 457, 463-64 (6th Cir.2005). The anti-recruiting rules, as applied to Coach Flatt for the spring practice letter and the follow-up phone calls, are narrowly tailored. The rule by its terms is limited to contacts “to secure or to retain a student for athletic purposes .... ” The rule also leaves open alternative channels of communication. Coach Flatt could have distributed recruiting letters to private athletic leagues not affiliated with any school system near Brentwood’s geographic area, or he could have distributed such materials to the administration of any public or private school with a request that those schools give them to students. The rule expressly endorses another alternative channel: potential students who on their own initiative contact the coaching staff seeking enrollment or financial aid information may be referred to Brent-wood’s principal, admissions department, guidance department, or the person in charge of financial aid.
The majority relies extensively on the required “roadmap” of our previous opinion in this case, but following that roadmap leads directly to the conclusion that there is no First Amendment violation. We held, in approximately one page of analysis, that the anti-recruiting rules amount to a content-neutral regulation subject to intermediate scrutiny. 262 F.3d at 553-54 (Part D). We also held, in another page of analysis, that the district court on remand should determine if the anti-recruiting rules are narrowly tailored to meet TSSAA’s substantial interests. Id. at 557-58 (Part F).
Repeatedly cited in those two pages are the adult entertainment ordinance case of City of Renton v. Playtime Theatres, Inc.,
475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), and the New York rock concert case of Ward v. Rock Against Racism, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). Under the indisputably applicable analysis of those cases, it is not possible to find a First Amendment violation on the primary factual findings of the district court in this case.
The zoning ordinance at issue in Renton prohibited the location of adult theatres within 1000 feet of any residential zone, single- or multiple-family dwelling, church, park, or school. 475 U.S. at 43, 106 S.Ct. 925. The Court held that the ordinance was to be evaluated under the test for content-neutral time, place, and manner restrictions on speech. Id. at 46-50, 106 S.Ct. 925. This is the test that we previously held to be applicable to the particular anti-recruiting rules in this case. The test is whether the ordinance “is designed to serve a substantial governmental interest and allows for reasonable alternative means of communication.” Id. at 50, 106 S.Ct. 925. The Court upheld the ordinance, ruling that the City could rely on the experiences of other cities “so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.” Id. at 51-52, 106 S.Ct. 925. The Court rejected arguments that the ordinance was underin-clusive or that it did not allow reasonable alternative means of communication.
Similar analysis compels a rejection of Brentwood’s First Amendment claim. In First Amendment jargon, TSSAA is attempting to regulate the negative secondary effects of Brentwood’s speech: the exploitation of middle school athletes, the subordination of academics to athletics, and unevenly matched teams. The district court recognized the validity of these interests. 304 F.Supp.2d at 994. TSSAA has furthered these interests by restricting *451 communication between the coach and a student prior to enrollment, just as many cities have restricted the erotic message of dancers by keeping it away from residential areas and churches. In both cases, the negative secondary effects are controlled by restricting the time and the nature of the messages a speaker may convey. In the context of a content neutral, time, place, or manner ordinance regulating adult oriented businesses, “[t]he First Amendment does not require a city, before enacting ... an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.” Renton, 475 U.S. at 51-52, 106 S.Ct. 925. “Renton ... does not require a ‘city to demonstrate^] ... with empirical data, that its ordinance will successfully lower crime’, at least ‘not without actual and convincing evidence from plaintiffs to the contrary.’ ” Baby Dolls Topless Saloons, Inc. v. City of Dallas, 295 F.3d 471, 481 (5th Cir.2002) (quoting City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 438, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002) (plurality opinion)). Under Renton, an ordinance regulating adult oriented businesses is valid so long as a city reasonably concludes that the time, place or manner restriction will be effective in curtailing the negative secondary effects of the businesses; empirical proof that the regulation is effective in lowering prostitution or crime in the case of every establishment affected by the ordinance is not required. See Alameda Books, 535 U.S. at 438-39, 122 S.Ct. 1728.
It is not right to say that because the parents in this case were happy to receive the letter and that there was no exploitation of students or subordination of academics in this particular case, TSSAA has relied on “shoddy data or reasoning” that does not “fairly support [its] rationale” for the enforcement of the anti-recruiting rules against Brentwood. Compare Maj. Op. at 430 (quoting Alameda Books, 535 U.S. at 438, 122 S.Ct. 1728). Applied to an adult oriented business, such reasoning would allow the owner of an adult business to mount an as-applied First Amendment challenge to a zoning ordinance if she could show that there were no negative secondary effects, such as prostitution or crime, at her establishment. Such is not the state of the law. The anti-recruiting rules, like restrictions on an adult oriented business, operate in the aggregate and are judged based on the overall effect on speech; a city is not required to show that every cabaret affected by an ordinance causes an increase in crime and prostitution before the ordinance can be applied to that business. The aggregate overall increase in crime from an adult oriented business is sufficient to force the operators of those businesses to disperse or congregate. Similarly, TSSAA is not required to demonstrate that each time it enforces the anti-recruiting rules it is stamping out the exploitation of student athletes or the bending of academics to the will of athletics for the anti-recruiting rules to be valid. It is sufficient that, in the aggregate, contact between an authority figure such as a coach and a potential student-athlete may lead to the exploitation of student athletes or the subordination of academics to athletics to justify restricting contact between coach and potential student. All TSSAA must show is that it had a reasonable belief that contact between a coach and a prospective student had the potential for abuse in order to restrict such contact, so long as alternative avenues to communicate the message are left intact. The rec *452 ord here shows such a reasonable belief.[2]
Moreover, the anti-recruiting rule as applied to Brentwood is narrowly tailored and leaves Brentwood alternative channels to communicate its message. Communications not for athletic purposes are of course permitted. Moreover, had the spring practice letter been distributed to representatives of private sports leagues near Brentwood, school administrators of other schools with a request for distribution, or students who on their own had contacted appropriate Brentwood officials, there would be no violation of the anti-recruiting rules.[3]
The as-applied nature of the district court’s inquiry does not require a different conclusion. A rule that precludes coach contact with not-yet-enrolled incoming students cannot be constitutional on its face if the underlying purposes of the rule have to be demonstrated every time the rule is applied in order to survive an as-applied challenge. Otherwise there would be no basis for having the rule. Just as the City of Renton does not have to show ill-effects from each proposed adult theatre placement in order to enforce its rule, and just as New York in the Ward case does not have to show ill effects each time it requires a band to use city provided sound technicians, TSSAA does not have to show ill effects each time it punishes coach contact with not-yet-enrolled students.
This conclusion is further supported by the traditional deference given to educators in carrying out policies that affect First Amendment rights. This dispute arises in the context of high school education, and the courts have consistently given great deference to educators’ decisions that have an impact on First Amendment rights. The Supreme Court has recognized the “important, delicate, and highly discretionary functions” that the educational system undertakes, and emphasized a consistent concern for “the need [to] affirm[] the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools.” Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 507, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). As *453 this court has stated, “In the First Amendment arena ... the Supreme Court ... has frequently emphasized that public schools have considerable latitude in fashioning rules that further then’ educational mission and in developing a reasonable fit between the ends and means of their policies.” Blau v. Fort Thomas Pub. Sch. Dist., 401 F.3d 381, 393 (6th Cir.2005). While not a public school, TSSAA is a part of the educational system that regulates what both parties concede is an important part of the high school experience. TSSAA should enjoy greater latitude in fashioning and applying recruiting rules that prescribe and control the conduct of overzealous coaches to further its educational mission, consistent with fundamental constitutional safeguards.
The Supreme Court and our court have both recognized that the federal courts are ill-equipped to regulate high school education. “It long has been the case that constitutional claims generally receive less rigorous review in the secondary and middle school setting than they do in other settings.” Id. Federal courts are. even less well-equipped to regulate high school athletics.
Finally, I note the “Catch-22” implication of the argument that the particular application of the anti-recruiting rules violated the First Amendment in this case. By prohibiting all communication between coaches and unenrolled students, the regulation is more rigorously content neutral. The more the prohibition is “tailored,” for instance by permitting some types of communication but not others, the less content neutral it becomes. An attack on the particular application of the no-communication rule thus gives TSSAA the Hobson’s choice of (1) making the prohibition more content specific, thereby coming closer to treading on First Amendment values, or (2) discarding the rule — not required if the rule is facially valid.
II.
Brentwood’s procedural due process rights were not violated because the presentation of ex parte evidence, if any, did not affect TSSAA’s final decision.
Based on TSSAA’s written decision and the testimony at trial, the district court clearly erred in determining that the TSSAA Board of Control heard ex parte evidence related to Bart King during its deliberations following Brentwood’s final hearing, and that the allegations regarding Mr. King were a basis for the penalty imposed. The only support for the district court’s finding that the King allegations were a basis for Brentwood’s punishment are two statements by TSSAA Board of Control President Mike Reed. In his deposition, Mr. Reed stated that the King allegation was one of the reasons Brentwood was found to have violated the anti-recruiting rules. At trial, Mr. Reed disclaimed his deposition testimony, stating that Brentwood’s final penalty was due to Coach Flatt’s letter rather than Mr. King’s activities. He went on to state that the Bart King allegations were a “factor” in “what was going on and so forth,” interrupting Brentwood’s counsel before the follow up question was finished.
With all due respect to the district court’s better position to judge the credibility and demeanor of witnesses, the district court clearly erred in determining that Mr. Reed’s single statement at deposition was sufficient to show that ex parte evidence was presented to the Board of Control and formed a basis for the penalty imposed on Brentwood. Michael Hammond and Ronnie Carter, in addition to Mr. Reed, testified that the King allegations were not a basis for the final penalty. Mr. Hammond further indicated that the *454 discussion of the King allegations during the Board of Control’s private deliberations was superficial. Gene Meness and Bernard Childress, the TSSAA investigators who looked into the King allegations, could not recall answering any question from the Board of Control related to Mr. King. Indeed, it is unclear what evidence they could have presented given that they did not interview Mr. King and the investigation consisted of a series of letters between Brentwood’s headmaster and TSSAA. In short, other than a single statement in a lengthy deposition, there is no evidence that TSSAA based its final penalty on ex parte evidence related to Bart King and the district court clearly erred in resting the entire weight of its finding that Brentwood’s procedural due process rights were violated on so slender an evidentiary reed.
III.
Finally, the fact that TSSAA has been granted state authority to regulate athletic competition requires us to affirm the district court’s conclusion that state antitrust immunity applies in this case. TSSAA is entitled to state antitrust immunity because, as an agent of the Tennessee Board of Education (the Board), TSSAA partakes of the Board’s state authorization to displace competition. TSSAA has done so using foreseeable means pursuant to clearly articulated Tennessee policy. As a result, TSSAA satisfies the applicable test for state antitrust immunity designed for municipalities and state political subdivisions. I would therefore affirm the decision of the district court granting summary judgment in favor of the TSSAA on Brentwood’s antitrust claims based on state antitrust immunity.

A. TSSAA is the Tennessee State Board of Education’s Agent

TSSAA is an agent of the Board and, as such, receives state antitrust immunity if it satisfies the test for municipalities or state political subdivisions. Our ruling in Consolidated Television Cable Service, Inc. v. City of Frankfort indicates that TSSAA is an agent of the Board. 857 F.2d 354 (6th Cir.1988). In that antitrust suit, we held that a municipal cable television corporation (that obviously was not itself a city) was an agent of the City of Frankfort and thus should receive state antitrust immunity if it satisfied the test for municipalities. Id. at 358-60. We classified the corporation as the City’s agent because the City exercised “ultimate control” over the corporation. Id. at 359.
More specifically, the City had “ultimate control” over the corporation because (1) it was a municipal corporation; (2) the corporation’s form and method had been dictated by the City; (3) the corporation existed at the City’s pleasure; (4) and the City appointed one half of the corporation’s board of directors. See Consolidated, 857 F.2d at 358-59.
Analogously, the Board exercises “ultimate control” over TSSAA. The Board enjoys ultimate control over TSSAA because the Board delegated to TSSAA all of TSSAA’s regulatory powers and therefore can revoke its authority at any time. See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass’n, 13 F.Supp.2d 670, 679-81 (M.D.Tenn.1998). The Board wields a general power to review, approve, or reaffirm the content of TSSAA’s regulations. See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass’n, 531 U.S. 288, 292-93, 299-301, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001). At its whim, the Board can revoke any TSSAA rule it dislikes. See id. The Board’s review power implicitly disciplines TSSAA. See id. Moreover, the Board’s chairman has power to designate a person or persons to serve in an ex-officio capacity on TSSAA’s governing bodies. Id. at *455 292, 121 S.Ct. 924. The Board may thus directly influence TSSAA’s most minute decisions by populating its decision-making bodies with people of its selection. The Board’s complete dominion over TSSAA is “ultimate control” under Consolidated, making TSSAA the Board’s agent.

B. The State Antitrust Immunity Test for Municipalities and State Political Subdivisions Applies to TSSAA’s Allegedly Anticompetitive Conduct

Because TSSAA is the Board’s agent, and the Board is a state agency, TSSAA need only satisfy the state antitrust immunity test for municipalities or state political subdivisions, not the more stringent test for private actors. See Consolidated, 857 F.2d at 359-62 (applying the test for municipalities to an agent of a municipality). In Consolidated we read Town of Hallie v. City of Eau Claire, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985), clearly to hold that the requirement of “active supervision” applied “only when the actor is a private party rather than a municipality.” Consolidated, 857 F.2d at 360. The test for municipalities and state political subdivisions allows TSSAA to act anticompetitively pursuant to “clear articulation of a state policy to authorize anticompetitive conduct.” See Town of Hallie, 471 U.S. at 40-42, 105 S.Ct. 1713 (internal quotation omitted). Tennessee law need not explicitly demand or permit displacement of competition. See id. at 41-42, 105 S.Ct. 1713. The anticompetitive conduct need only be the “foreseeable result” of state authorization. Id. at 42, 105 S.Ct. 1713.

C. Tennessee’s Policy to Displace Competition in Interscholastic Athletics is Evident in Its Broad Grant of Authority to Regulate Interscholastic Athletics

Tennessee’s policy to displace competition in interscholastic sports may be inferred from its grant of authority to the Board. As the Supreme Court has noted, Tennessee law vests in the Board wide-ranging authority to regulate primary and secondary education. See Brentwood Acad., 531 U.S. at 292, 121 S.Ct. 924 (citing TENN. CODE ANN. § 49-1-302). Section 49-1-302 grants broad powers that include the authority to regulate athletics programs; this section further serves as the basis for TSSAA’s status as the agency responsible for regulating interscholastic school sports in Tennessee. See id. Under the Supreme Court’s decision in City of Columbia v. Omni Outdoor Advertising, such broad authority to set restrictions on competitive endeavors makes evident the state’s policy to displace competition. See 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991).
In Omni, the Supreme Court held that state antitrust immunity applied to a city that had used its state-granted zoning authority to restrict billboard construction. See id. at 368-79, 111 S.Ct. 1344. In holding that state delegation of zoning authority to a city evinces a state policy to displace competition, the Court said: “The very purpose of zoning regulation is to displace unfettered business freedom in a manner that regularly has the effect of preventing normal acts of competition, particularly on the part of new entrants. A municipal ordinance restricting the size, location, and spacing of billboards (surely a common form of zoning) necessarily protects existing billboards against some competition from newcomers.” Id. at 373, 111 S.Ct. 1344. Consequently, the mere delegation of zoning authority to the city adequately evinced a state policy to displace competition.
In this case, the delegation to TSSAA of comprehensive power to regulate inter *456 scholastic athletics is the equivalent of the city’s grant of zoning authority in Omni. Just as the exercise of zoning authority in Omni stopped a company from competing in the billboard construction market, TSSAA’s anti-recruiting rules restrict schools’ efforts to build their best teams by wooing talented players with scholarships or perquisites. In a broader sense, also, TSSAA’s potential efforts to determine the venues of games, what teams will face each other, the grouping of schools into divisions, the dates of the athletic seasons or pre-seasons, and any number of other restrictions run the risk of “preventing normal acts of competition” in a manner analogous to the zoning authority in Omni. Such regulations are a “foreseeable result” of Tennessee’s decision to authorize the statewide regulation of interscholastic sports.
The Supreme Court has impliedly acknowledged the inherent need for rules that “prevent[] normal acts of competition” in the football context. The Court has written regarding the National Collegiate Athletic Association (NCAA):
What the NCAA and its member institutions market in this case is competition itself — contests between competing institutions. Of course, this would be completely ineffective if there were no rules on which the competitors agreed to create and define the competition to be marketed. A myriad of rules affecting such matters as the size of the field, the number of players on a team, and the extent to which physical violence is to be encouraged or proscribed, all must be agreed upon, and all restrain the manner in which institutions compete. Moreover, the NCAA seeks to market a particular brand of football — college football.
NCAA v. Bd. of Regents of the Univ. of Okla., 468 U.S. 85, 101-102, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). These sorts of restrictions, and their anticompetitive effects, are no less foreseeable here.

. I concur in Part II.C. of the majority opinion rejecting Brentwood's substantive due process claim.

. The majority makes the remarkable observation that TSSAA provided no "evidence to support the notion that ensuring that high schools compete in interscholastic sports in an equitable manner is a substantial state interest,” and no evidence "explaining why competitive equity is an important value.” Maj. Op. at 427. Presumably the City of Renton need not provide evidence for the obvious proposition that crime increases are against the public interest, and New York in the Ward case need not provide evidence that appropriate modulation of band concerts is in the public interest. Similarly, it can hardly be argued that TSSAA needs to provide evidence for the obvious proposition that more evenly balanced high school football matches are in the public interest.

. The majority opinion also discounts the interpretive commentary accompanying the anti-recruiting rules as non-binding to find that the anti-recruiting rules are not narrowly tailored and burden substantially more speech than necessary. Maj. Op. at 429. Thus, the majority avoids the fact that Brent-wood was punished for behavior specifically cited as examples of conduct that would violate the anti-recruiting rules. The commentary to the anti-recruiting rules is non-binding only to the extent that TSSAA has a certain amount of discretion in enforcing the rule, and the examples cited in the interpretive commentary are a non-exclusive list. The discretion vested in TSSAA under the anti-recruiting rules is not so broad that the anti-recruiting rules, despite content neutrality, become a de facto prior restraint on speech. See City of Lakewood v. Plain Dealer Publ’g Co., 486 U.S. 750, 757, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (no standards for denial or grant of permit for newsrack on public property); Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).